IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF IDAHO

| | | |
|---|---|---|
| CORPORATE PROPERTIES, LTD.,<br>a Rhode Island corporation, | )<br>)<br>) | CASE NO. CV 05-231-S-MHW |
| | ) | **MEMORANDUM DECISION** |
| Plaintiff, | ) | **AND ORDER** |
| | ) | |
| v. | ) | |
| | ) | |
| THE HERSHEY COMPANY, | ) | |
| a Delaware corporation, | ) | |
| | ) | |
| Defendant. | ) | |
| _____ | ) | |

Currently pending before the court for its consideration is Plaintiff's motion for partial
summary judgment (docket # 17), filed July 5, 2006.  The Court, having reviewed all materials
submitted by the parties, and having heard oral argument, finds that the motion should be
granted.

**I.**
**Background.**

The Court will briefly describe the facts at this juncture.  They will be developed in more
detail during the analysis of the partial motion for summary judgment.  In January, 2002, The
Hershey Company ("Hershey") entered into a brokerage contract with Corporate Properties,
LTD. ("CPL"), for the disposition of property Hershey owned in Wheat Ridge, Colorado.  The

contract called for CPL to perform a market analysis of the property, make recommendations to Hershey, and if accepted, CPL would have a certain period of time in which to procure a buyer for the property, for which Hershey would pay CPL a 6% commission.  After another real estate broker executed the sale of the facility to one of CPL's identified  prospective buyers, Hershey refused to pay CPL any promised commission.  CPL alleges breach of contract, breach of the covenant of good faith and fair dealing, and unjust enrichment.

## II.
## Standard of review.

Motions for summary judgment are governed by Fed. R. Civ. P. 56.  Rule 56, which provides in pertinent part, that judgment "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."  Fed. R. Civ. P. 56(c).

The United States Supreme Court has made it clear that under Rule 56, summary judgment is required if the nonmoving party fails to make a showing sufficient to establish the existence of an element which is essential to his case and upon which he/she will bear the burden of proof at trial.  *See Celotex Corp. v. Citrate*, 477 U.S. 317, 322 (1986).  If the nonmoving party fails to make such a showing on any essential element of his case, "there can be 'no genuine issue as to any material fact,' since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial."  *Id.* at 323. *See also* Rule 56(e).

Under Rule 56 it is clear that an issue, in order to preclude entry of summary judgment, must be both "material" and "genuine."  An issue is "material" if it affects the outcome of the

litigation.  An issue is "genuine" when there is "sufficient evidence supporting the claimed

factual dispute . . . to require a jury or judge to resolve the parties' differing versions of the truth

at trial,"*Hahn v. Sargent*, 523 F.2d 461, 463 (1st Cir. 1975) (quoting *First Nat'l Bank v. Cities

Serv. Co., Inc.,* 391 U.S. 253, 289 (1968)), *cert. denied,* 425 U.S. 904, 96 S. Ct. 1495, 47 L.Ed.2d

754 (1976), or when the "evidence is such that a reasonable jury could return a verdict for the

nonmoving party." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S. Ct. 2505, 2510,

91 L.Ed.2d 202, 212 (1986).   The Ninth Circuit cases are in accord.  *See British Motor Car

Distributors, Ltd. v. San Francisco Automotive Industries Welfare Fund*, 882 F.2d 371 (9th Cir.

1989).

## III.
## CPL's motion for partial summary judgment.

CPL is only seeking summary judgment as to Count One, the breach of contract claim,

and asserts that it is entitled to judgment as a matter of law on the claim that Hershey breached

the contract to pay a 6% commission and that there are no material facts in dispute to prevent

judgment from being entered.

**A.     Background as to the real estate brokerage contract and the real estate sales

contract(s).**

The contract at issue in Count One is a real estate brokerage contract that was entered

into between Hershey and CPL on January 4, 2002.  (See Amended Complaint, docket # 31, at

exhibit "A.")  The first part of the contract provided CPL with a three-month period to analyze

Hershey's Wheat Ridge, Colorado property and the real estate market and then formulate

recommendations to Hershey incidental to the property's disposition.  CPL was to be paid its

expenses incurred in connection with this work, but no other compensation.

For the second part of the contract, if Hershey accepted CPL's recommendations, then CPL would have the exclusive right to sell the property for one (1) year and would receive a 6% commission if the property was sold or leased during that year or within six (6) months following the expiration of the year to a CPL-procured buyer/tenant.  Sometime between May and June, 2002, CPL presented recommendations for the disposition of the property to Hershey which Hershey accepted and agreed that CPL had the exclusive right to sell the Wheat Ridge property.

At first, CPL was working with a developer, Trammell Crow, who had several prospective clients that were interested in the building with some modifications.  (See Swartz affidavit, docket # 24-7, exhibit 13.)  However, this eventually turned into a dead end for CPL and Hershey.  On May 14, 2003, an e-mail from Jeffrey Edelman at Hershey was sent to Gordon Simmering, the President of CPL, informing him that Hershey was bringing on a second real estate firm, "CBRE," with "full in-market capabilities" and located in Denver.  Nonetheless, Hershey indicated that it wanted to continue its relationship with CPL, and Edelman stated:

> Clearly, we will honor the 6% commission for any sales/leases which are *entered into* during the next six months and which have been introduced to the opportunity by CPL [Note that we would like you to submit a list within the next week].

(See Swartz affidavit, docket # 24-7, exhibit 14, emphasis added.)

On May 20, 2003, CPL provided Hershey with a list which identified 212 potential prospective buyers for the property.  Included on the list was the name Brian Mott.  (See Amended Complaint, docket # 31, at Exhibit "B," page 1, line 8.)

Two days later, on May 22, 2003, Edleman sent a letter to Simmering to "confirm" the prior e-mail about CBRE, and he again stated:

**Memorandum Decision and Order - Page 4**

>Hershey will honor the 6% commission for any sales/leases which
>are *entered into* during the next six months and which have been
>introduced to the opportunity by CPL, based upon the list
>submitted on May 20, 2003.

(See Amended Complaint, docket # 31, at Exhibit "C," emphasis added.)  Three months later, on

August 22, 2003, Brian Mott, the "managing member" of Kearn Creek Holdings, LLC., entered

into a "Contract to Buy and Sell Real Estate (Commercial)" with Hershey for the price of $2.375

million.  The subject property of the contract was the Wheat Ridge property.

There were several bumps in the road on the way to closing, however.  After the initial

contract was entered into and $150,000 earnest money was paid into escrow, the buyer began

performing the due diligence evaluation of the property and red flags went up about hazardous

environmental conditions on the property.  By November, 2003, the parties nearly terminated the

transaction but instead agreed to "revive" it and they entered into an "Amendment to Contract to

Buy and Sell Real Estate" ("First Amendment").  (See Swartz affidavit, docket # 24-8, exhibit

19.)

In the First Amendment, the parties agreed that the original "Agreement" was revived "as

amended by this Amendment" and "shall continue forward as if no termination occurred."  (See

Swartz affidavit, docket # 24-8, at exhibit 19, page 2, ¶ 3.)  The parties further agreed that

various environmental assessments and testing of the property would be performed, some at

seller's expense and some at buyer's.  Report(s) would accordingly be produced for the parties'

review and there was also a provision for further extension of the closing if necessary.

Despite the potential environmental problems, and as if to emphasize their intent to stay

true to the terms of the original contract, the parties reiterate this at the end of the First

Amendment where it is set forth that:

**Memorandum Decision and Order - Page 5**

> **Ratification of Agreement.**  By executing this Amendment, Seller
> and Buyer each hereby revives and ratifies the Agreement, and
> confirms that the Agreement, as revived and amended hereby,
> remains in full force and effect.

(See Swartz affidavit, docket # 24-8, at exhibit 19, page 3, ¶ 11, emphasis supplied.)

A year later, in November, 2004, after studies revealed the presence of certain environmental conditions on the Wheat Ridge property that the state of Colorado was going to require be remediated, the parties were now faced with a piece of property that was reduced in value in its present condition.  They again considered terminating the Agreement, but instead entered into negotiations to arrive at a "Second Amendment to Contract to Buy and Sell Real Estate" ("Second Amendment").  (See Swartz affidavit, docket # 24-8, at exhibit 20.)

In the Second Amendment, the parties again revived the original Agreement "as amended by both the First Amendment and this Second Amendment."  (See Swartz affidavit, docket # 24-8, at exhibit 20, page 2, ¶ 3.)   The Second Amendment further refers to a separate "remediation agreement" relative to the environmental remedial actions that the state of Colorado would require the parties to perform and the costs the parties would bear.  For the sake of ease, the parties divided the property into two parcels:  Phase I and Phase II.  Phase I was free and clear of any environmental concerns and Phase II was the portion of the property that needed remediation.

The most prominent aspect of the Second Amendment was that the parties renegotiated the price of the property and Mott/Kearn, presumably in exchange for paying for a portion of the remediation, was now going to be paying $1,439,650 for the Phase I parcel, and $650,349 for Phase II.  This made the total purchase price of the two parcels equal $2,089,999, which was

**Memorandum Decision and Order - Page 6**

$285,001 less than the original purchase price of $2.375 million. (See Swartz affidavit, docket # 24-8, at exhibit 20, pages 3-4, ¶¶ 8A and 9A.)

The Second Amendment also included the "Ratification of Agreement" paragraph where it is emphasized that the parties 'revive and ratify the Agreement' and "confirm that the Agreement (as previously amended) remains in full force and effect." (See Swartz affidavit, docket # 24-8, at exhibit 20, page 4, ¶ 11.)

The sale of the property by Hershey, pursuant to the original sales contract, finally occurred on February 1, 2005, as evidenced by the "Seller Closing Certificate," which is signed by a vice president of the Hershey Corporation. (See Amended Complaint, docket # 31, at Exhibit "C.") The Court notes that this Certificate again refers back to the original Contract where it states:

> [A]ll representations and warranties made by Seller in Addendum Section 4 of the Contract to Buy and Sell Real Estate (Commercial) (the "Contract") *dated August 22, 2003*, between Seller and Buyer are true and correct on and as of the date of this Certificate. . .   .

(*Id.*, emphasis added.)

## B.     Discussion and analysis.

There can be no dispute that the parties first entered into a contract on January 4, 2002, which was signed by both parties. (See Amended Complaint, docket # 31, at Exhibit "A.") This contract initially set forth all of the terms that governed the relationship between Hershey and CPL relative to the disposition of the Wheat Ridge property.

After the transaction with the first potential buyer of the property, Trammel Crow, did not pan out, Hershey made the decision to move on in May, 2003, and Hershey evidenced its

intent to continue the terms of the 2002 contract with CPL.  By May 14, 2003, the record

indicates that Hershey wanted CPL to continue to work for it to find a buyer, as stated in the e-

mail sent by Jeffrey Edleman at Hershey to Gordon Simmering at CPL.

   CPL asserts that, "The substantive terms of the contract at issue are memorialized in

Hershey's May 14, 2003, offer to CPL," and in particular where Edleman stated in his e-mail to

Simmering  that, "Clearly we will honor the 6% commission for any sales/leases which are

*entered into* during the next six months and which have been introduced to the opportunity by

CPL [Note that we would like you to submit a list within the next week]."  (See Plaintiff's brief

in support, docket  # 17-2, at 6, emphasis supplied.)

   CPL argues that it responded to this offer on May 20, 2003, by providing Hershey with a

list of 212 prospective buyers, pursuant to Hershey's request in the May 14 e-mail.  (See Swartz

affidavit, docket # 24-7, at exhibit 15.)  On the cover sheet of the list of prospective buyers, CPL

states:

>   This list is being sent to you with the express understanding and
>   agreement between CPL and Hershey that Hershey will honor the
>   6% commission for any sales and/or leases *entered into during the*
>   *next six months (May 14, 2003 to November 14, 2003)* with
>   individuals or companies introduced to the opportunity by CPL
>   (see attached list).

(*Id.* at 1, emphasis added.)  It is CPL's position that this response constituted an acceptance of

Hershey's offer.  Brian Mott was one of the names on the list of prospective buyers.  (*Id.* at 2,

line 7; and Amended Complaint, docket # 31, at Exhibit "B," page 1, line 8.)

   Finally, CPL contends that the May 22, 2003, correspondence from Hershey to CPL

acknowledges receipt of the list of prospective buyers and then goes on to reiterate and confirm

the agreement that Hershey would pay CPL a 6% commission "for any sales/leases which are

*entered into during the next six months* and which have been introduced to the opportunity by CPL, based upon the list submitted on May 20, 2003." (See Amended Complaint, docket # 31, at Exhibit "C," emphasis added.)

The focus here is that the language in the contract and the follow on correspondence regarding the sale/lease of the Wheat Ridge property all use the phrase 'entered into within six months' relative to the payment of the 6% commission. In fact, there is no dispute that a Contract to Buy and Sell Real Estate was entered into on August 22, 2003, which was only three months after the contract between Hershey and CPL was created in May, 2003. Further, the requirement that the buyer be someone "introduced to the opportunity by CPL, based upon the list submitted on May 20, 2003," was also satisfied because the buyer was Brian Mott, "managing member" of Kearn Creek Holdings, LLC., whose name appeared on the list of prospective buyers submitted by CPL

Hershey argues that, even though a contract to sell the property was originally entered into within six (6) months of the agreement between Hershey and CPL, it does not owe CPL a commission because the transaction did not close until February 1, 2005, which was outside of the six month time frame. In other words, Hershey is arguing that the contract language means that the sale of the property had to <u>close</u> within six months of the time of that the commission agreement was entered into in order for CPL to have earned a commission. Hershey's theory is an unlikely one in practical application in the commercial real estate industry, however. In every commercial real estate deal, there are often delays due to issues with financing and having to perform due diligence on the property. Under Hershey's theory, a seller would only have to

delay the closing transaction one day past the six months to avoid paying the real estate broker's commission, which could be easily accomplished

Here, due to environmental issues, the August 22, 2003, contract for the sale of the property was, as described in detail above, amended two times after the execution of the original Contract to Buy and Sell Real Estate (Commercial).  (See Amended Complaint, docket # 31, at Exhibit "D;" and Swartz affidavit, docket # 24-8, at exhibits 19 and 20.)  Both of the Amendments "revived" and "ratified" the original "Agreement," incorporated it by reference, and emphasized that the original Agreement "remains in full force and effect."  (*Id.*)

The language is repetitive in the two Amendments and there is no ambiguity in the language.  It is clear that the parties intended to stay true to the terms of the original contract of sale as far as possible, with the exception of needing to accommodate  the requirements of the environmental assessments, reporting, and eventual remediation.  The environmental issues, however, do not have an impact on the agreement to pay commission, except that it might have an impact on the amount of the commission because the sale price of the property was reduced.

Hershey's position is that is does not owe CPL a commission on the ground that the sale of the property did not close until February, 2005, fifteen (15) months *after* the six-month period ended that CPL had the exclusive right to sell the property, as stated in the contract and follow on correspondence between Hershey and CPL.  Under Hershey's line of argument, CPL's window to earn the 6% commission ran between May, 2003, and November, 2003, during which time CPL had to procure a buyer and the sale of the property had to close.

The Court does not agree with Hershey's interpretation of the contract language.  The crucial phrase to focus on is contained in Hershey's own offer in the May 14, 2003 e-mail where

Jeffrey Edleman states, "Clearly, we will honor the 6% commission for any sales/leases which are *entered into during the next six months* and which have been introduced to the opportunity by CPL. . . ."  (Emphasis added.)  CPL mirrors this language in its response on May 20, 2003, and Hershey does not object.  Hershey again reiterates the same language in the May 22, 2003 letter to CPL.  There can be no misinterpretation that the parties mutually established that the commission Hershey would pay to CPL was for sales/leases *entered into* within six (6) months. The plain interpretation of the language "*entered into*" means just that CPL was required to produce a buyer willing to *enter into* a contract for the sale of the Wheat Ridge property within six months.  The language does not go farther than that to also require that the contract for sale close within the six month period of time.

    In summary, CPL did introduce a buyer who was willing to enter into a contract with Hershey for the purchase of the Wheat Ridge property.  This buyer, Brian Mott on behalf of Kearn Creek, was one of the prospects on CPL's lists.  The contract for the sale of the property was entered into between Hershey and Mott in August, 2003, which was only three (3) months into CPL's six month period of time to perform.  A closing did eventually take place in February, 2005.  Accordingly, CPL did everything it was required to do to meet the terms of the contract that existed between CPL and Hershey to earn a 6% commission.  Therefore, the Court finds that Hershey's failure to pay CPL the 6% commission is a breach of the contract between CPL and Hershey and that CPL's Motion for Partial Summary Judgment will be granted.

## ORDER

Based on the foregoing, the Court being otherwise fully advised in the premises, **IT IS HEREBY ORDERED that:**

1)       Plaintiff's motion for partial summary judgment (docket # 17), filed July 5, 2006, is GRANTED.

**2)       The Court will hold a status conference with counsel on *Monday, February 26, 2007, at 1:30 p.m.* by telephone.  Plaintiff's counsel shall be responsible for initiating a conference call with all parties on the line to the Court at this number:  (208) 334-1504. For any questions regarding the status conference, counsel should contact the Court's courtroom deputy, Anne Lawron, at (208) 334-9387.**



DATED:  **February 13, 2007**

Honorable Mikel H. Williams
United States Magistrate Judge

**Memorandum Decision and Order - Page 12**